## CHAFFEE & Co. *v.* UNITED STATES.

1. The action of debt lies for a statutory penalty, because the sum demanded is certain, but though in form *ex contractu* it is founded in fact upon a tort. The necessity of establishing a joint liability in such cases does not exist; it is sufficient if the liability of any of the defendants be shown. Judgment may be entered against them and in favor of the others, whose complicity in the offence for which the penalty is prescribed is not proved, as though the action were in form as well as in substance *ex delicto*.

2. The general rule which governs the admissibility of entries in books made by private parties in the ordinary course of their business, requires that the entries shall be contemporaneous with the facts to which they relate, and shall be made by parties having personal knowledge of the facts, and be corroborated by their testimony, if living and accessible, or by proof of their handwriting if dead, or insane, or beyond the reach of the process or commission of the court.

3. The cases of *Fennerstein's Champagne* and *Cliquot's Champagne*, reported in the 3d of Wallace, commented upon and explained, and distinguished from the present case.

4. It is error to instruct a jury, in an action for penalties for alleged frauds upon the revenue, that after the government has made out a *primâ facie* case against the defendants, if the jury believe the defendants have it in their power to explain the matters appearing against them, and do not do so, all doubt arising upon such *primâ facie* case must be resolved against them.   The burden rests upon the government to make out its case beyond a reasonable doubt.

ERROR to the Circuit Court for the Southern District of Ohio; the case being thus:

The forty-eighth section of the act of June 30th, 1864, "To provide internal revenue to support the government," &c.,* thus enacts:

" All goods, wares, merchandise, . . . on which duties are imposed by the provisions of law, which shall be found in the possession or custody, or within the control of any person . . . for the purpose of being sold or removed by such person . . . in fraud of the internal revenue laws, or with design to avoid payment of said duties, may be seized by any collector . . . who shall have reason to believe that the same are possessed, had, or held for the purpose or design aforesaid, and the same shall be forfeited to the United States.

" And also all articles of raw materials found in the possession of any person . . . intending to manufacture the same for the purpose of being sold by them in fraud of said laws, or with design to evade the payment of said duties, and also all tools, implements, instruments, and personal property whatsoever, in the place or building, or within any yard or inclosure where such articles on which duties are imposed, as aforesaid, and intended to be used by them in the fraudulent manufacture of such raw materials, shall be found, may also be seized by any collector or deputy collector, as aforesaid, and the same shall be forfeited as aforesaid.

" *And any person who shall have in his custody or possession any such goods, wares, merchandise, . . . subject to duty as aforesaid, for the purpose of selling the same with the design of avoiding payment*

---

* 13 Stat. at Large, 240.

*of the duties imposed thereon, shall be liable to a penalty of $500, or not less than double the amount of duties fraudulently attempted to be evaded, to be recovered in any court of. competent jurisdiction.*

"And the goods, wares, merchandise, which shall be so seized by any collector, may, at the option of the collector, during the pendency of such proceedings, be delivered to the marshal of said district, and remain in his care and custody and under his control until final judgment in such proceeding shall be rendered."

This statute being in force, Sidney Chaffee, Highland Chaffee, and Rue Hutchins, trading as Chaffee & Co., were distillers, at Tippecanoe, a small town upon the Miami Canal, a canal which traverses the State of Ohio from Cincinnati on the south line of the State, by a course north and south, to Toledo in the north. The custom of Chaffee & Co. was to ship whiskies in both directions; that is to say, northward towards Toledo and southward to Cincinnati. Going north such whiskies had to pass through a place called Piqua, which was the first place on the canal at which toll was payable when the vessel was going from Tippecanoe in the direction named. Going south, towards Cincinnati, the whiskies had to pass through Dayton, the first place at which toll was payable when the vessel was going from Tippecanoe south. There was no other distillery at Tippecanoe. There were, however, in the whole distance between Piqua and Dayton three others.

The Miami Canal, on which these whiskies were transported, had been made and for some years was managed by the State of Ohio. And a statute for " the regulation of the navigation thereof and for the collection of tolls," enacted that no boat should be permitted to pass on it unless the master had first obtained a clearance for each voyage from the collector of tolls, which clearance the collector nearest to the place at which the boat began her voyage was required to issue. To enable the collector to issue clearances that should truly represent what cargo was on board, the act made it obligatory on the master to exhibit to the collectors " a just and true account or bill of lading" of " each and every article of property on board," when the boat

should depart on her voyage, or which should be taken on board afterwards; and further, to insure accuracy, every collector receiving a bill of lading might require the master to verify it by his oath. The knowingly delivering any false bill was made an indictable offence, punishable with fine in three times the value of the property omitted or falsely stated in the bill. The bill of lading thus required was to be exhibited to the collector where any portion of the cargo should be unladen. The act proceeded:

"It shall be the duty of every collector to whom bills of lading are required to be presented, in order to obtain a clearance for any voyage, to make out from such bill or bills of lading, in a book, *a certificate*, containing a pertinent description of the articles composing the cargo of the boat, for which clearance is about to be issued, *properly classified and designated with reference to the rates and amount of tolls chargeable* thereon; which certificate shall be signed by the master, who shall also attest on oath or affirmation to the correctness thereof, if required by the collector, before the clearance shall be issued.

"In every case where a certificate is required to be made out and signed, the collector shall enter upon the clearance a correct list or statement of all articles of lading contained in such certificate, properly classified and designated, with the amount of tolls charged and received thereon, and shall sign his name thereto.

"On the arrival of any boat at the place of destination, or at any place in the course of the voyage where there is a collector's office, the master thereof shall immediately present to the collector the bill or bills of lading together with the clearance.

"No boat shall proceed on its voyage until the bill or bills of articles of lading on board thereof, together with the clearance and list of passengers, shall have been presented to the collector, nor *until all necessary examinations and comparisons of such bills of lading, clearance, and cargo, shall have been made*, nor until all tolls payable at such office shall have been paid; and the collector may detain both the bills of lading and clearance until the necessary entries shall be made on such clearance, and until all the requisitions of this section shall be complied with.

"No part of the cargo of any boat shall be unladen at the termination of any voyage until the clearance, together with

the bill or bills of lading of the whole cargo, shall have been presented to the proper collector, and a permit obtained from such collector for such unlading, which permit such collector is hereby required to grant, after a reasonable time shall have elapsed for the examination of such clearance, bills of lading and cargo, and on the payment of all tolls which shall remain due."

Though, as already said, the canal had been originally managed by the State, it was not so managed at the time when the whiskies of Chaffee & Co. were transported. The State had leased it, the lease containing this provision:

"Such rights, privileges, and franchises now exercised by the State as may be necessary to manage, control, and keep in repair the public works, and collect tolls for the navigation of the same, together with the right to appoint superintendents, collectors, &c., who shall have and exercise the same power and authority in the collection of tolls and water rents, and the levy of fines, as can now by law be exercised by similar officers and agents appointed by the State; and said lessee or lessees shall be governed by the rules and regulations for navigating the canals now in force, subject to such alterations and additions as may hereafter be established by law," &c.

The purpose of the *company*, which had now leased the canal, apparently was to follow the rules about clearances that the statute had prescribed. But whether the rules had been followed with statutory rigor was less clear. Captains would come, it appeared, to the collector's office and report for a clearance; the collectors generally, though not always, knowing them. The bills of lading were usually produced, but occasionally a captain would happen to have left his bills behind, and in such case, if he was a person known to the collector, and a person whose word the collector thought he could safely take as to what was on board the boat, he would sometimes dispense with the production of the bills, and make out the clearance from the captain's verbal report; though this would not be done *ordinarily* with any master, and never in the case of "new men" whom the collectors did not know. Captains were never interrogated upon their

oaths; nor did the collector ever overhaul and make personal inspection of cargoes, or in this way or in any way have actual and personal knowledge whether the representation of the captains or of the bills was strictly accurate. But however made, the captain would always certify the representation on which the clearance was granted to be true. When, however, arriving at its destination, the boat came to be unladen, it was testified " to be the duty of the collector at such place of unlading to see, when the boat is unloading, that the captain has given in his freight correctly; and if he sees any freight that is not on the clearance, he then brings the captain to an account for it."

The certificates which the captains signed on the books of the collector would be in this form:

" COLLECTOR'S OFFICE,
DAYTON, December 2d, 1865.

" I, H. U. French, master of the boat A. Hopkins, do certify that the following is a full and true statement of all the cargo taken on board said boat for transportation on her present passage, and that I have paid toll thereon as follows, to wit, to Piqua, for original cargo, on clearance No. 893, viz.:

| The Boat. | From. | To. | | Miles. | Tolls. |
|---|---|---|---|---|---|
| 900 bushels barley, . . | Troy. " To Dayton. | Cincinnati. " | . . . . 43,200 | 104 " | $2 06 21 60 |
| 50 barrels high wines, . 1645.29 bushels oats, . | Tippecanoe. Troy. | Cincinnati. " | 18,000 51,314 | . . . 86 | 7 20 18 68 |
| | | | | | $49 54 |

" H. U. FRENCH."

These certificates, as the reader will observe, purport to show the name of the boat and master, what cargo was on the boat, where the cargo came from, and where it was going, the number of miles of the transit, and the amount of toll; but in themselves did not show who owned or who shipped the cargo.

In the particular case of Chaffee & Co.'s whiskies, as they passed through Dayton, the collector was one Brown.

Either he or a young man in his employ kept, for the most part, the books, Brown directing the manner, and the purpose, as testified to, being to keep them regularly. The young man, at the time of the suit hereinafter mentioned as brought by the United States against Chaffee & Co., was dead; but the entries not made by Brown himself, were, without denial, in his handwriting; a few excepted, which were in the handwriting of a grandson of Brown, whose entries Brown represented to be " always reliable."

The collectors at Piqua and at other points where toll was payable, when whiskies were sent in the northern direction, followed the same general mode of making out the clearances, that is to say, they were made out in general from the freight bills, though occasionally where the collector knew the captain, and thought he could trust in his word, from the captain's verbal representations; no actual knowledge being had by the collectors here more than at Dayton, of the truth of what the captain certified to.

At *Cincinnati*, of course, there were no further clearances. What the collector then did, or at least what it was his duty to do, was to check the clearances from other places, and see that they were right. He made memoranda in a book of freights as shown by them, or as found by himself, but these no captain signed.

In one direction or in the other, Chaffee & Co. had sent large quantities of whisky. They had also paid taxes on large quantities, confessedly on as much as 6045 barrels. .

In this state of things, and under the forty-eighth section of the statute of June 30th, 1864, already quoted, the United States brought suit in the court below against Highland Chaffee, Sidney Chaffee, Rue Hutchins (all heretofore named), *and William Chaffee*, "late partners, doing business under the firm name of H. D. Chaffee & Co."

.The declaration, which was founded on the italicized portion of the section above quoted, of the act of June 30th, 1864,* charged that the "*defendants*," from February 1st,

---

* See *supra*,·pp. 517, 518.

1865, to September 1st, 1866, were residents at Tippecanoe, &c., they, *the defendants*, then and there did "carry on and transact the business of distillers of spirits, *under said firm name of H. D. Chaffee & Co.*, for which they were duly licensed," and were thereby bound to pay all the revenue and taxes imposed upon them, and to comply with the act passed June 30th, 1864, in reference to the spirits by them manufactured and distilled; nevertheless, that the *defendants*, with intent to evade the payment of the lawful duties upon 200,000 gallons of distilled spirits, "*by them distilled* at their distillery," did, between said dates " unlawfully, knowingly, and fraudulently, have in their custody and possession, and under their control, 200,000 gallons of distilled spirits (each gallon subject to a tax of $2 imposed by law, which is unpaid), for the purpose of selling the same, with the design of avoiding the payment of the duties imposed by law thereon," and " *the defendants* did then and there unlawfully and fraudulently sell, dispose of, and remove the same, so that the lien of the plaintiff has been lost, and the taxes remain unpaid; which act of having in their custody and possession, and under their control, said distilled spirits, for the purpose of selling the same, with the design of avoiding the payment of the duties imposed by law thereon, in fraud of the internal revenue laws of the United States, by *said defendants*, was contrary to the form of the statute in such case made and provided, whereby the *defendants* forfeited and became liable to pay to the plaintiffs, for the offence aforesaid, the penalty of $800,000, double the amount of the taxes imposed by law upon said distilled spirits." The declaration concluded with an allegation that " an action hath accrued to the plaintiffs to demand and have of the *defendants* the sum of $1,010,000," &c.

The defendants demurred generally: the ground of the demurrer being, that the penalty prescribed by the act applied only to persons who had at the time of seizure the goods in their possession, and then held them for sale with a design to avoid the payment of duty upon them, and not to those who had held them with that design, but had parted

with them. The demurrer was overruled. The defendants Sidney Chaffee and Hutchins then pleaded *not guilty* and *nil debet,* and the defendant William Chaffee pleaded separately that he was not a member of the firm of H. D. Chaffee & Co., or interested in its business. The district attorney filed the common *similiter* to the pleas of Sidney Chaffee and Hutchins, and traversed by replication the plea of William Chaffee.

The death of Highland Chaffee was then suggested, and it was ordered that as to him " all proceedings be stayed and abate."

The case being subsequently called for trial, the government abandoned, in form, the suit against William Chaffee, the abandonment being entered of record.

On the trial, the defendants having proved that during the time embraced in the controversy, they had paid taxes on full 6045 barrels of whisky made by them during that time, the government, in order to show that the defendants had in their custody or possession, dutiable whisky, " for the purpose of selling the same with the design of avoiding payment of the duties imposed thereon," offered in evidence the books of the collectors at Piqua and Dayton, which the collectors produced, to show by different certificates in them, on which clearances had been granted at Dayton or Piqua, the collection offices nearest to Tippecanoe, at which place, as already said, Chaffee & Co. were the only distillers, that 200,000 gallons more whisky had been moved from the said place than duties were paid on. Certificates from the books at Cincinnati checking the clearances, and showing what whiskies had arrived there, were also offered.

The collectors at Piqua, Dayton, and Cincinnati were examined. As would be inferable from what has been already stated, they had little personal knowledge of any facts bearing on the controversy.

The handwriting of Kaufman, the young man who made some entries at Dayton, and who was dead, was proved, and the grandson of Brown, who made some others, was produced and sworn. But the government examined none of

the captains whose names were signed to the several certificates in the books at Dayton and Piqua, as to the genuineness of their signatures, nor was proof given of the handwriting or death of any of them. The collector at Cincinnati did not testify from any knowledge of his own that his books contained true records of what whiskies had arrived. Some, but not all, of the captains were examined as witnesses, and testified to the carriage of whisky from Chaffee's distillery on their boats, at dates corresponding, and of quantities corresponding to their several certificates respectively. The government also offered evidence tending to prove that the distillery of Chaffee & Co., at Tippecanoe, was of a capacity equal to a production of fifty barrels of whisky per day when run to its fullest capacity; a larger number of barrels than it was admitted that duties had been paid on.

The defendants objected to the reception of the books, on the ground that it was hearsay and *res inter alios acta.* But the evidence was admitted, "not as evidence that whisky came from or belonged to the defendants, but only as competent to show that a given quantity passed a certain point on a given day, and if the government did not connect this whisky with the defendants, the testimony would be stricken out." The defendants excepted. The evidence was never afterwards stricken out.

For the purpose of showing the quantity of whisky on hand on the 26th of October, 1865, the defendants offered the evidence of twenty-three witnesses. This testimony tended to prove that on the 1st day of July, 1864, when the distillery stopped, there was a large quantity of whisky on hand (perhaps 2000 barrels), which was stored in the cellar, grain-rooms, and other places in or about the distillery; that this whisky, or the greater part of it, remained on the premises until the 26th of October, 1865, the several witnesses testifying to seeing it at different times from the 1st of July, 1864, until the 26th of October, 1865.

The government, in rebuttal, offered the evidence of eleven witnesses. This testimony tended to prove that from

the 1st of July, 1864, to the summer of 1865, there was very much less whisky—certain witnesses said not much more than fifty barrels—at the distillery than was asserted by the defendants and testified to by their witnesses; and that, in the autumn of 1865, up to the 26th day of October, there was little if any whisky there.

Sidney Chaffee lived in Tippecanoe, and was about the distillery most of the time, and attended to making purchases, and to other business of the firm of H. D. Chaffee & Co., and Hutchins, during the time he was a partner, was employed about the distillery. He testified that the firm of H. D. Chaffee & Co. kept ordinary books of accounts. He was present in court during the entire trial, and Hutchins was in court at the close of defendant's testimony. Before the commencement of the trial, to wit, on the 3d of March, 1870, the government had caused this notice to be served on the defendants:

"TIPPECANOE, March 3d, 1870.

" *The United States* v. *H. D. Chaffee & Co.*

" The defendants will take notice that the plaintiffs have filed a motion and have thereby moved the court, that the defendants are required to produce, on the 8th of March, 1870, the day set for trial of this case, the following books, papers, and documents, now in their possession and under their control, which contain evidence pertinent to the issue herein, to wit, all books, papers, and statements required by law to be kept or made by defendants, as distillers, at Tippecanoe, Ohio, from July 1st, 1864, to October 1st, 1866, and all other books, papers, statements, and memoranda kept by them, pertaining to their business, during the same period at Tippecanoe.

"W. M. BATEMAN,
District Attorney of the United States."

At the close of the defendants' testimony, the books and papers not having been produced, the counsel for the government called for their production. The counsel for the defendants stated that they were at Buffalo. The counsel for the government refused to receive the statement as an excuse for the non-production of the books, and demanded

their production; and that S. L. Chaffee should be called as a witness for the defence to explain why they were not produced, and to testify generally in the case. The defendants did not produce the books and papers, and did not call either S. L. Chaffee or Hutchins as a witness in the case.

Before charging, the court informed the counsel that it would allow evidence to be introduced at any stage of the case, to supply any omission or by way of explanation.

It then proceeded to charge. Commenting on the books of the different collectors which had been received by it, and relying on the case of *Fennerstein's Champagne*, reported along with the case of *Cliquot's Champagne*, in 3 Wallace,* it said:

"So far as the nature of this testimony is concerned there has been, in modern times, a very great change of opinion; and I do not know that if I should search all the books I ever read, or call to mind all my experience at the bar, I could select a more fitting instance to illustrate my own opinion of the respective values of these two classes of testimony than the contrast between the persuasive effect of memoranda, made in the ordinary course of business by those who have no motive to falsify—whose duty it was to record them at the time the transactions took place—on the one hand, and on the other the grossly conflicting verbal testimony given in this cause as to the amount of whisky on hand in October, 1865. Compare the two and see upon which, in its own nature, as men of common sense, you can repose your credence with most confidence. The one is plain, simple, and direct, without a motive of falsification. The other presents a spectacle like this: A phalanx of twenty men swearing on their oaths to some two thousand barrels of whisky, at a given time, in a given place, and two-thirds as many, equally intelligent and equally respectable, with equal opportunities of knowledge, swearing there is not fifty barrels there. It is a hapless conflict, leaving the mind in uncertainty, with nothing whatever to rest upon.

"It is, however, before you, and you will look carefully over its details, and give due weight to the ingenious and able criticisms

---

* Pages 145, 114.

which have been made by the distinguished counsel for the defendants."

Passing to the proofs generally, and to the effect to be given to the non-production of the books of the firm, and relying on *Clifton* v. *United States*,* in 4 Howard, it instructed the jury among other things, as follows:

"The proof in the outset may be defective. It may not be sufficient to enable you, without any doubt or hesitation, to find against the defendants, and still it may be your duty, nevertheless, so to find; for although I instruct you that the case must be made out beyond all reasonable doubt in this, as well as in criminal cases, yet the course of the defendants may have supplied, in the presumptions of law, all which this stringent rule demands. In determining, therefore, in the outset whether a case is established by the government, you will dismiss from your minds the perplexing question, whether it is so made out beyond all doubt. It needs not, in the exigencies of this case, be so proved in order to throw the burden of explanation upon the defendant, if from the facts you believe he has within his reach that power. In the end all reasonable doubt must be removed; but here, at this stage, you need say only 'is the case so far established as to call for explanation?'

"If, then, you conclude that, unexplained and uncontroverted by any testimony, the opening proof would enable you to find against the defendants for the claim of the government, or any material part of it, you will then take up their testimony in view of the principle announced. Although the counsel for the defence, when this principle was announced, with spirit and energy begged leave to differ with the court in reference to the effect of not producing the books, and not swearing the defendants, still the presumption of law is that client and counsel have deliberately, and with full knowledge of the law and all its presumptions, elected to withhold this proof, and you will not in the smallest degree abate the full application of the principle on any notion that it may have been misapprehended. The rule is one which I am confident will commend itself to your common reason. It is this: 'Without exception, where a party has proof in his power, which, if produced, would render certain

material facts, the law presumes against a party who omits it, and authorizes a jury to resolve all doubts adversely to his defence. The same rule is applicable in a case where a party once had proof in his power which had been voluntarily destroyed or placed beyond his reach.'

"If you believe the books were kept which contained the facts necessary to show the real amount of whisky in the hands of the defendants, in October, 1865, and the amount which they had sold during the next ten months, or that the defendants, or that either of them, could, by their own oath, resolve all doubts on this point; if you believe this, then the circumstances of this case seem to come fully within this most necessary and beneficent rule."

To the instructions thus given the defendants excepted.

The jury found that "*the defendants owe* to the plaintiffs the sum of $235,680, *in manner and form* as the plaintiffs have complained against them."

Motions by the defendants for a new trial and in arrest of judgment were overruled, and the court entered judgment on the verdict.

The defendants now brought the case here, alleging that the court had erred among other ways—

1. In overruling the defendant's demurrer.

2. In overruling the motion in arrest of judgment.

3. In admitting the entries contained in the certificate-book of the collectors at Dayton, Piqua, and Cincinnati.

4. In instructing the jury as it had done.

The case was thoroughly and interestingly argued on both sides, with a full citation of authorities.

*Messrs. G. Hoadly and J. F. Follett (with whom were E. M. Johnson and J. D. Cox), for the plaintiff in error:*

1. The demurrer should not have been overruled, and the judgment should still be arrested for a misconception of the meaning of the section of the act on which the suit is brought. The whole section on which the suit is brought is homogeneous; its purpose was to insure the forfeiture of dutiable articles, "*found*" in the possession or custody or

within the control of any person for this unlawful purpose, and the punishment of the person in the custody or possession of "*such* goods." The act does not refer to a design merely conceived or entertained by the owner of dutiable property, to sell it with the design of defrauding the government. It is aimed at an overt act, a fraudulent attempt, and this is defined as custody, possession, or control, for the purpose of selling or removing, and not merely possession or control coincident with such purpose. In other words, the punishable possession is not that which is simultaneous with, but that which is "*for the purpose*" of fraud.

2. Independently of this the judgment should be arrested. The action is *debt* brought against Highland Chaffee, Sidney Chaffee, *William Chaffee*, and Rue Hutchins, partners, as H. D. Chaffee & Co. During the progress of the cause Highland Chaffee died. William Chaffee, by plea traversed the averment that he was a partner, and the jury having been sworn and testimony given, the government abandoned the claim against him.

This verdict, therefore, which was given, that "the *defendants*" owe, was bad in law. The action being *ex contractu*, upon an issue made up in part by the plea of *nil debet*, and the verdict expressing, not that the defendants are guilty, but that they *owe*, there could be in law no judgment against less than the whole number of those original defendants who were surviving, except upon a plea of personal disability of the acquitted defendant, not inconsistent with the truth of the declaration, as of lunacy, coverture, infancy, bankruptcy.

Sir William Blackstone,* speaking of implied contracts, says :

"Of this nature are such as are necessarily implied by the fundamental constitution of government, to which every man is a contracting party. And thus it is that every person is bound and hath virtually agreed to pay such particular sums of money as are charged on him by the sentence, or assessed by

---

* 3 Commentaries, 159.

the interpretation of the law. . . . Whatever, therefore, the laws order any one to pay, that becomes instantly a debt which he hath beforehand contracted to discharge."

Chief Baron Comyn* says:

" Debt lies upon every *contract, in deed or in law.* As if an act of Parliament gives a penalty, and does not say to whom nor by what action it shall be recovered, an action of debt lies upon such statute by the party grieved."

So also Smith Thompson, J.:†

"Actions for penalties are civil actions, both in form and in substance, according to Blackstone. The action is founded upon that implied contract which every person enters into with the state to obey its laws."

So also the Supreme Court of Massachusetts, in *Burnham* v. *Webster*,‡ in which Parsons, C. J., says:

" But if debt *qui tam* be sued against several, demanding a joint forfeiture, on a plea of *nil debet* all the defendants ought to be found indebted, because the form of the action and plea is on a joint contract, although the debt arises from a tort."

The action in *Burnham* v. *Webster* was brought, in debt, to recover four penalties of $15 each, for taking fish by a seine or drag-net, against the form of the statute. A passage in Chitty, and the case of *Bastard* v. *Hancock*, in Carthew, may indeed be cited, opposed to this view; but the great authority of Comyn, Blackstone, Thompson, and Parsons,§ the first names on either side of the Atlantic, cannot be set aside by a passage of Chitty on Pleading, sustained by a case in Carthew, a reporter, the accuracy of whose work Lord Thurlow questioned.

3. The court erred in its rulings upon the admission of testimony. The Cincinnati book being a record of arrivals, while the Dayton and Piqua books are records of clearances,

---

* Comyn's Digest, Title, Debt, A, 1.

† Stearns et al. *v.* United States, 2 Paine, 301, 311.

‡ 5 Massachusetts, 270; and see Stilson *v.* Tobey, 2 Id. 521; and Hill *v.* Davis, 4 Id. 140.

§ Wallace's Reporters, 246.

different questions would present themselves as to each, if each was admissible. . But no one of the books was a public record, nor as such had any one superior value, or any freedom from the ordinary conditions of admissibility of private books of entry. The collector at Cincinnati was not bound to keep any record of discharges. He gave no clearances after a vessel arrived. *His* books certainly were not made in pursuance of statute.

By specifying the required contents of the certificates, viz., a pertinent description of the articles composing the cargo "properly classified and designated, *with reference to the rate and amount of tolls chargeable thereon*," the statute of Ohio shows that the State meant to keep only such a record of the movement of property on its canals as might be necessary to secure its tolls. The same barrel, if it went forward and back on the canal, would be regarded and entered on clearances as two barrels. But was it two barrels, and is the distiller to be charged for two?

The entries here were secondary evidence. The bills of lading from which they were made were the primary sources of knowledge; but no foundation was laid for the introduction of secondary evidence in the case.

Again, the entries were not competent as the declarations of *collectors*, for the collectors had no knowledge on the subject. They merely prepared the records from an examination of the bills of lading, or from what was a much less certain source, the recollections of captains as stated to them orally.

Nor were they competent as the certificates of the *captains*, because the certificates, considered as entries or declarations of the captains, were incompetent without proof of the death or non-accessibility of the captains, if they were not called. In the Cincinnati cases the captains signed nothing.

It will not be argued that any of these certificates would be admitted in any English court; they do not come within the leading case of *Price* v. *Lord Torrington*,* nor any of the later cases.

---

* 1 Salkeld, 285; 1 Smith's Leading Cases, 390.

4. As to the errors in the charge. In substance, the charge was this: That while, in the end, the government must prove its claim true beyond a reasonable doubt, yet if before the defendants gave any proof it made out a plausible, reasonably-proved case, so far established as to call for explanation as to any material part of its claim, then, if the defendants failed to produce their books and to testify in their own exculpation, *the law* presumed against them, resolving all doubts adversely to their defence; and all reasonable doubts having been thus removed by their fatal omission to prove their innocence by their own testimony and their books, it became the duty of the jury to resolve all doubts against the defendants in ascertaining the amount of the penalty to be assessed, by starting with the government's *primâ facie* case for $750,000, or whatever other sum such case established, and marking out any or all of it, as far only as the jury could so do without any doubt or hesitation.

This is no caricature, but a fair summary of the charge. Such a charge substantially withdrew from the defendants their constitutional right of trial by jury, and converted what at common law and in equity would have been their protection, viz., the right to refuse to testify to their own conviction, into the machinery for their sure destruction, actually placing them in no better position than if they had failed to plead and the jury had been sworn to assess the debt and damages upon default.

*Mr. S. F. Phillips, Solicitor-General, contra:*

1. The clause in the forty-eighth section, upon which the declaration was framed, and which in the section as quoted *supra*, p. 517, is italicized, differs from the preceding clause in that it does not require a present possession for the institution of proceedings. On the contrary, such proceedings may be founded upon any previous possession. The draftsman of the section commences by providing punishments for two specific offences, and then reverts to the first-named punishment for the purpose of providing for certain details

in the proceedings incident to the enforcement of such punishment.

Legislators often use the word *shall* for *shall have.* It is rarely that they provide punishment for a man who *shall have* committed crime; on the contrary, they almost always say (*ex. gr.*) he who *shall* commit treason shall suffer death, &c.

2. The action being *debt upon a penal statute* against *three,* *two* only of whom are found indebted, judgment may well be given against the two. The particular distinction, first taken in *Bastard* v. *Hancock,*[*] reported by Carthew, between debt upon penal statutes and other forms of debt, was not under consideration by Blackstone, or Comyn, or Smith Thompson, J., referred to on the other side. The authorities relied on by the other side are, therefore, no authorities against that distinction. There remains for the plaintiffs in error the great authority of the elder Parsons. The case in Carthew, however, was not cited before him. And even Parsons, C. J., must yield a point of pleading to the extraordinary authority of Chitty and Sergeant Williams.[†] The passage in Chitty has stood the test of twenty editions without change. The case in Carthew is the leading authority, and according to the reporter, it was decided on the point of the proper *entry,* "after great debate" in the C. B. Lord Thurlow was fond of undervaluing persons who stood in his way. His judgment of a common-law reporter like Carthew may be questioned. Two better common-lawyers, Willes and Kenyon, speak highly of Carthew as a reporter.[‡]

3. As to the admissibility of evidence. Conceding that the entries in the canal books are but ordinary entries in books kept in the course of official duty, how do they stand?

The canal books had been kept at three different offices, Piqua, Dayton, and Cincinnati; the first, of *clearances northwardly* from the place where the distillery was located; the second, of those *southwardly;* and the third, of *arrivals* at the

---

[*] Page 361.

[†] For the latter, see Coryton *v.* Lithebye, note, 2 Saunders, 117, *c.*

[‡] Wallace's Reporters, 246, 3d edition.

southern termination of the canal.   The course of business made it the duty of three persons to keep such books at the above places, respectively.   The books of the latter were a check upon those of the former for all freight coming down from, or from above, those points; and it was the duty and practice of collectors at such points to *inspect the freight as the boat was unloaded*, above, for the purpose of checking the books at the clearing offices, &c.   For all entries at Dayton there are corresponding ones at Cincinnati.

So far as entries were made by persons whose duty it was, and who are living, and shown not to have *known* the truth of those entries, the principle which underlies the competency of this class of evidence is a confidence in the general honesty and truthfulness of such entries, like that felt in the general uniformity of all natural phenomena.   All intelligent business persons feel great confidence in its revelations, irrespective of any inquiry into the intelligence of the officer who made the entries.   It is enough to know that *these* are the freight books, say of such and such a steam navigation, or railroad, or canal company, to cause one to conciliate at once favor for their contents.

Much evidence quite as reliable as that of most other classes will be excluded, if it be required of clerks of companies doing transportation business by ships, railways, or canals, that they shall have a personal knowledge of the truth of every detail of freight entered by them in the course of duty; or, otherwise, that their books, kept in the only practicable way, shall not be competent evidence of such matters.   A vast mass of facts intimately connected with commercial business, and therefore of great importance in litigation, is every day recorded in such books, in cases where it is impracticable, not to say impossible, that the entry-maker should know their truth.

The principle in *Price* v. *Lord Torrington* was as great a shock to the conservative thought of the profession at the beginning of the last century as its development administered by the court below is claimed to be to such thought now.   It may well be said that such development is as nec-

essary to the condition of commerce now as the form in which it originated was to the *business* of 1704. Such seems to be the tendency of those views of this court in *Fenner-stein's Champagne* and *Cliquot's Champagne*, the former of which cases especially the court considered as making these entries evidence.

4. As to the exceptions to the charge. In considering any paper *piecemeal*,—taking particular passages and excepting to *them*—risk is run of doing injustice to its meaning by tearing connected passages asunder. Certain words attributed to the learned judge below may not have been just the words which he would have selected in his study, with opportunity for weighing them and fixing their exactest import, but the general drift is intelligible, and as reflected in the whole (the practical import of which is, that the jury was authorized to resolve all doubts against a party who continued silent when he ought to speak) is correct. The abstract rule laid down is not only applicable to the present case but universally applicable, and as the court had already announced that it would *at any stage of the case* allow evidence to be introduced by way of explanation or to supply an omission, objection to it seems unreasonable.*

Mr. Justice FIELD delivered the opinion of the court.

The object of the demurrer to the declaration was to raise the question whether the penalty prescribed by the forty-eighth section of the Revenue Act of June 30th, 1864, was intended to apply to any persons except those in whose possession, custody, or control the goods seized are found, and who then hold them for the purpose of sale, with design to. avoid the payment of the duties. That section authorizes the forfeiture of dutiable goods when held for sale with that design, and of the raw materials and tools intended for use in the manufacture of such goods, and imposes a penalty upon the person who, with that purpose and design, has the goods

---

* See what is said by Alderson, B., in Boyle *v.* Wiseman, 10 Exchequer, 650

in his possession or custody, or under his control.   It is the possession with the unlawful purpose that the act was intended to reach by a forfeiture of the goods found with the party, and the punishment of such party.   The defendants contend that such possession must exist when the seizure is made; the government insists that it is immaterial when the possession existed, if it was accompanied at the time with the unlawful purpose.

When this case was argued the court consisted only of eight judges, and upon the question raised by the demurrer they are equally divided in opinion, and therefore no decision can be had thereon.

It does not appear by the record on what special grounds the motion in arrest of the judgment was made, but it was assumed in the argument of counsel that not only the question, which we have already mentioned as arising upon the demurrer, was presented on the motion, but also the further question, whether the action, being debt against several, and the plea being *nil debet*, judgment could be entered against any less than the whole number surviving, except upon a plea of personal disability of the acquitted defendant, not inconsistent with the truth of the original declaration, such as coverture, infancy, or bankruptcy.   The action was originally brought against four defendants, Highland Chaffee, Sidney Chaffee, William Chaffee, and Hutchins, who are described as late partners doing business under the firm name of H. D. Chaffee & Co.   During the progress of the cause Highland Chaffee died.   William Chaffee pleaded that he was not, at the time designated in the declaration, or at any other time, a member of the firm of H. D. Chaffee & Co., or interested in its business, and on the trial the plaintiffs abandoned their claim against him and allowed judgment to pass in his favor.   Sidney Chaffee and Hutchins pleaded both not guilty, and *nil debet*, and the verdict of the jury was that the defendants owed the plaintiffs the sum of two hundred and thirty-five thousand and six hundred and eighty dollars, in manner and form as they had complained against them.   Now the argument is, that as the declaration

alleges a joint liability of all the defendants, the plea of *nil debet* by two of them—that they were not indebted to the plaintiffs in manner and form as alleged—puts in issue such joint liability, and the finding against the two with the acquittal of the other, showed that the plea of *nil debet* was true, and that there was no such joint liability, but the contrary established; and, therefore, the judgment should be arrested. The answer to the argument is, that the rule stated as to the effect of the plea of *nil debet* only applies where the action is debt upon a simple contract. The action of debt lies for a statutory penalty, because the sum demanded is certain, but though in form *ex contractu*, it is founded in fact upon a tort. The necessity of establishing a joint liability in such cases does not, therefore, exist; it is sufficient if the liability of any of the defendants be shown. Judgment may be entered against them and in favor of the others, whose complicity in the offence, for which the penalty is prescribed, is not proved, precisely as though the action were in form as well as in substance *ex delicto*.

The testimony admitted on the trial, to which the defendants specially excepted, consisted of the certificate-books of certain collectors of tolls on the Miami Canal. That canal extends from Cincinnati to Toledo, in Ohio, passing through Tippecanoe. The nearest collector's office north of this place was at Piqua, the nearest south of it was at Dayton. Between these points there were four distilleries, three besides that of the defendants. The canal belongs to the State, but was leased in 1861 to private parties for ten years, which term was extended, in 1867, for ten years more. The act of the legislature authorizing the lease provided that it should vest in the lessees such rights, privileges, and franchises then exercised by the State, as might be necessary to manage, control, and keep in repair the canal and collect tolls for its navigation, with the right to appoint superintendents and collectors, who should exercise the same power and authority in the collection of tolls and water rents and the levy of fines, as could then be exercised by similar officers and agents appointed by the State; and that the lessees

should be governed by the rules and regulations for navigating the canals then in force, subject to such alterations as might thereafter be established by law.    By an act of the State then in force, passed in 1840,* no boat or float was allowed to start on a voyage on the canal without having a clearance from the collector at the nearest point of departure, or to pass any collector's office on the canal without producing the clearance with its bills of lading.    In order to obtain the clearance, the master of the boat or float was required to present the bills of lading to the collector, and before it could be issued, it was the duty of the collector to make out from the bills of lading, in a book to be provided for that purpose, a certificate containing a description of the articles composing the cargo of the boat or float, properly classified and designated with reference to the rates and amount of tolls chargeable thereon; and that certificate was to be signed by the master, and, if required, its correctness was to be attested by his oath or affirmation.    On the arrival of the boat or float at its place of destination, no part of the cargo could be unladen, landed, or removed from the canal until the clearance and bills of lading were presented to the collector at the place and his permit obtained.

It was proved on the trial that, between the dates mentioned in the declaration, the defendants had paid taxes on over six thousand barrels of whisky manufactured by them. But the plaintiffs endeavored to prove that a larger quantity was transported by vessel or rail from Tippecanoe between these dates, and that there was no other distillery at that place, except the one owned by the defendants, from which it could have been received; and thus show that the defendants had had in their possession or custody within that period, distilled spirits for sale with the design of avoiding the payment of duties thereon, as alleged in the declaration. For this purpose they gave in evidence, against the objection of the defendants, the certificate-books of the collectors of

---

* Entitled " An act to provide for the protection of the canals of the State of Ohio, the regulation of the navigation thereof, and for the collection of tolls;" approved March 28th, 1840.

tolls at Piqua, above Tippecanoe, and at Dayton, below it; and also a certificate-book kept by the collector at Cincinnati, showing the arrivals of freight at that port. The certificates stated the place from which the whisky was received, and its quantity, but not the parties to whom it belonged, or by whom it was -shipped. The collector at Dayton testified as to the sources of information from which he made up the certificates, and it was admitted that the collectors at the other points would testify substantially to the same effect as to the sources of the information on which they acted. These were generally the freight bills presented by captains of boats, as required by the act of 1840; but sometimes the bills were not presented, and then the simple statements of the captains were received, if they were well known. The collectors had no personal knowledge of the truth of the statements contained in the certificates; and though when a clearance was wanted they were at liberty to require the oath or affirmation of the captains signing the certificates to their correctness, it does not appear that either oath or affirmation was ever exacted. Some of the captains, but not all of them, were produced as witnesses at the trial as to their carriage of whisky from the distillery of the defendants, but they were not examined as to the genuineness of their signatures to the certificates; nor were the signatures of the other captains, who were not produced, proven, nor their death shown or absence accounted for. All the certificates were admitted without distinction. When the books were offered, objection was taken to their introduction, on the general ground that they were hearsay evidence and transactions between third parties. Subsequently a similar objection was taken to each of the certificates on a motion to exclude them from the jury.

The books were not public records; they stood on the same footing with the books of the trader or merchant. The fact that the lease was from the State did not change the character of the entries made by the collectors, who were simply agents of the lessees, and not public officers of the State. Their admissibility must, therefore, be deter-

mined by the rule which governs the admissibility of entries made by private parties in the ordinary course of their business.

And that rule, with some exceptions not including the present case, requires, for the admissibility of the entries, not merely that they shall be contemporaneous with the facts to which they relate, but shall be made by parties having personal knowledge of the facts, and be corroborated by their testimony, if living and accessible, or by proof of their handwriting, if dead, or insane, or beyond the reach of the process or commission of the court. The testimony of living witnesses personally cognizant of the facts of which they speak, given under the sanction of an oath in open court, where they may be subjected to cross-examination, affords the greatest security for truth. Their declarations, verbal or written, must, however, sometimes be admitted when they themselves cannot be called, in order to prevent a failure of justice. The admissibility of the declarations is in such cases limited by the necessity upon which it is founded.

We do not deem it important to cite at length authorities for the rule and its limitation as we state it. They will be found in the approved treatises on evidence, and in the numerous cases cited by counsel on the argument. In this court the case of *Nicholls* v. *Webb*, reported in 8 Wheaton,* and that of *Insurance Company* v. *Weide*, reported in 9 Wallace,† are illustrations of the rule. In the first case, it was held that after the death of a notary, his record of protests was admissible upon proof of his death and handwriting, the court observing that it was the best evidence the nature of the case admitted of, that the party being dead, his personal examination could not of course be had, and that the question was, whether there should be a total failure of justice or secondary evidence should be admitted to prove the facts. In the second case, the books and ledger of the plaintiffs were admitted in evidence to show the amount and value

* Page 326.                    † Page 677.

of goods lost by the burning of their store, upon the testimony of the parties who made the entries that they were correct, the court holding that the books "would not have been evidence *per se*, but with the testimony accompanying them, all objections were removed;" and referring to cases decided in the Supreme Court and Court of Appeals of New York, in support of the ruling. In both of these cases the entries were made by parties personally cognizant of the facts. This knowledge of the party making the entry is essential to its admissibility. His testimony, if living, would be rejected if ignorant of the facts entered, and it would be strange if his death could improve its value in that respect.

The cases of *Fennerstein's Champagne* and *Cliquot's Champagne*, reported in the 3d Wallace,* do not infringe upon this rule. Those were cases where it became necessary to establish the market value of certain wines in France, and such value could only be ascertained by sales made by dealers in those wines in different parts of the country, and the prices at which they were offered for sale, and circumstances affecting the demand for them. It would not be proved by a single transaction, for that may have been exceptional; the sale may have been made above the market price, or at a sacrifice below it. Market value is a matter of opinion which may require for its formation the consideration of a great variety of facts. To arrive at a just conclusion prices-current, sales, shipments, letters from dealers and manufacturers, may properly receive consideration. A party, without having been previously engaged in any mercantile transaction, may be able to give with great accuracy the market value of an article the dealing in which he has watched, and in stating the grounds of his opinion as a witness, he may very properly refer to all these circumstances, and even the verbal declarations of dealers.† Now in the cases in 3d Wallace, statements of dealers in the champagne, or of agents of dealers, made in the course of their duties as agents, and letters from dealers and prices-current, were

---

* Pages 114, 145.          † Alfonso *v.* United States, 2 Story, 426.

admitted as bearing upon the point sought to be established, the market value of the wines. There is no analogy between these cases and the one at bar. What was the market value of the wines in France was, as already said, a matter of opinion. Whether the defendants had in their possession or custody, between certain dates, 200,000 gallons of distilled spirits, or any other quantity, for the purpose of selling the same with a design to avoid the payment of duties thereon, was a question of fact and not of opinion.

If now we apply the rule which we have mentioned to the certificate-books of the canal collectors their inadmissibility is evident. . They were not competent evidence as declarations of the collectors, for the collectors had no personal knowledge of the matters stated; they derived all their information either from the bills of lading or verbal statements of the captains. Nor were the books competent evidence as declarations of the captains, because it does not appear that the bills of lading were prepared by them, or that they had personal knowledge of their correctness, or that their verbal statements, when the bills of lading were not produced, were founded upon personal knowledge; and besides, many of the certificates were admitted without calling the captains who signed them, and without proof of their death or inaccessibility.

It remains to consider the exceptions taken to the charge to the jury. These are sixteen in number, and are directed principally to the error which pervades the whole charge, consisting in the instruction reiterated in different forms, that after the government had made out a *primâ facie* case against the defendants, if the jury believed the defendants had it in their power to explain the matters appearing against them, and did not do so, all doubt arising upon such *primâ facie* case must be resolved against them. As we have stated, the defendants had paid taxes on over six thousand barrels of whisky manufactured by them between the dates mentioned in the declaration. Nearly this number was traced to consignees. By the canal-certificates and railroad receipts the government had shown in that way a trans-

portation from Tippecanoe of over two thousand barrels more. It was admitted that no charge was to be made to the defendants for any amount they had on hand in October, 1865, although the declaration charges the possession with the unlawful purpose to have been between February 1st, 1865, and September 1st, 1866. The defendants endeavored to show that they had on hand at that time between two and three thousand barrels, and for that purpose called in a large number of witnesses, neighbors, and others, who had visited the distillery during that period. The estimates of the amount by these witnesses differed materially, being made from recollection. The defendants were present at the trial, but were not called as witnesses. It was proved that they kept books, consisting of day-books, journals, and ledgers.

Now the court instructed the jury that it was a rule, without exception, that where a party has proof in his power which, if produced, would render material facts certain, the law presumes against him if he omits to produce it and authorizes a jury to resolve all doubts adversely to his defence; that although the case must be made out against the defendants beyond all reasonable doubt in this case as well as in criminal cases, yet the course of the defendants may have supplied in the presumptions of law all which this stringent rule demanded. "In determining, therefore, in the outset," said the court to the jury, "whether a case is established by the government, you will dismiss from your minds the perplexing question whether it is so made out beyond all doubt. It need not, in the exigencies of this case, be so proved in order to throw the burden of explanation upon the defendant, if from the facts you believe he has within his reach that power. In the end, all reasonable doubt must be removed, but here, at this stage, you need say only, is the case so far established as to call for explanation." . . . "If, then, you conclude that, unexplained and uncontroverted by any testimony, the opening proof would enable you to find against the defendants for the claim of the government, or any material part of it, you will then take up their testimony in

view of the principle" stated, that of presuming against a, party who fails to produce proofs in his possession. And again, the court instructed the jury that the law presumed that the defendants kept the accounts usual and necessary for the correct understanding of their large business and an accurate accounting between the partners, and that the books were in existence and accessible to the defendants unless the contrary were shown, and then said to the jury, "If you believe the books were kept which contained the facts necessary to show the real amount of whisky in the hands of the defendants in October, 1865, and the amount which they had sold during the next ten months, or that the defendants, or either of them, could by their own oath resolve all doubts on this point; if you believe this, then the circumstances of this case seem to come fully within this most necessary and beneficent rule."

The purport of all this was to tell the jury that, although the defendants must be proved guilty beyond a reasonable doubt, yet if the government had made out a *primâ facie* case against them, not one free from all doubt, but one which disclosed circumstances requiring explanation, and the defendants did not explain, the perplexing question of their guilt need not disturb the minds of the jurors; their silence supplied in the presumptions of the law that full proof which should dispel all reasonable doubt. In other words, the court instructed the jury, in substance, that the government need only prove that the defendants were presumptively guilty, and the duty thereupon devolved upon them to establish their innocence, and if they did not they were guilty beyond a reasonable doubt.

We do not think it at all necessary to go into any argument to show the error of this instruction. The error is palpable on its statement. All the authorities condemn it.*  The case of *Clifton* v. *United States*, in 4 Howard, cited by the court below, was decided upon a statute which cast the

---

* Doty *v.* State, 7 Blackford, 427 ; State *v.* Flye, 26 Maine, 312; Commonwealth *v.* McKie, 1 Gray, 61.

burden of proof upon the claimant in seizure cases after probable cause was shown for the prosecution, and, therefore, has no application.* The instruction sets at naught established principles, and justifies the criticism of counsel that it substantially withdrew from the defendants their constitutional right of trial by jury, and converted what at law was intended for their protection—the right to refuse to testify—into the machinery for their sure destruction.

JUDGMENT REVERSED, and the cause

REMANDED FOR A NEW TRIAL.

---

* 1 Stat. at Large, 678; *Locke v. United States,* 7 Cranch, 339.