## NEW YORK CENT. & H. R. R. CO. v. UNITED STATES.

(Circuit Court of Appeals, First Circuit.    December 4, 1908.)

### No. 774

1. CARRIERS (§ 37*)—INTERSTATE CARRIERS OF LIVE STOCK—STATUTORY REGULATIONS—ACTION FOR PENALTIES.

A declaration, in an action by the United States to recover the penalty for violation of the 28-hour law (Act June 29, 1906, c. 3594, 34 Stat. 607 [U. S. Comp. St. Supp. 1907, p. 918]) by permitting cattle to remain in a car for a period longer than 28 hours without unloading for rest, water, and feeding, which describes the defendant railroad company as "lessee" of the road and otherwise follows the language of the statute, is sufficient after verdict, although it does not expressly allege that defendant was at the time operating the road.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 37.*]

2. CARRIERS (§ 37*)—INTERSTATE CARRIERS OF LIVE STOCK—STATUTORY REGULATIONS—ACTION FOR PENALTIES.

Technical objections to the declaration, in an action by the United States against a railroad company to recover the penalty for violation of the 28-hour law (Act June 29, 1906, c. 3594, 34 Stat. 607 [U. S. Comp. St. Supp. 1907, p. 918]), considered, and *held* without merit after verdict.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 37.*]

3. CARRIERS (§ 37*) — INTERSTATE CARRIERS OF LIVE STOCK—STATUTORY REGULATIONS—ACTION FOR PENALTIES.

So far as relates to the rules of pleading and proof, an action by the United States to recover the penalty for violation of the 28-hour law (Act June 29, 1906, c. 3594, 34 Stat. 607 [U. S. Comp. St. Supp. 1907, p. 918]) is a civil and not a criminal action.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 37.*]

4. CARRIERS (§ 37*)—INTERSTATE CARRIERS OF LIVE STOCK—STATUTORY REGULATIONS—ACTION FOR PENALTIES—PLEADING.

In an action by the United States against a railroad company to recover the penalty for violation of the 28-hour law (Act June 29, 1906, c. 3594, 34 Stat. 607 [U. S. Comp. St. Supp. 1907, p. 918]), which requires a carrier to unload cattle for rest, water, and feeding within each consecutive 28 hours, "unless prevented by storm or by other accidental or unavoidable causes, which cannot be anticipated or avoided by the exercise of due diligence and foresight," the plaintiff is not required to allege or prove the nonexistence of accidental or unavoidable causes which might have prevented a compliance with such requirement; but such causes are matters of defense.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 37.*]

5. CARRIERS (§ 37*)—INTERSTATE CARRIERS OF LIVE STOCK—STATUTORY REGULATIONS—VIOLATION.

In the provision of the 28-hour law (Act June 29, 1906, c. 3594, 34 Stat. 607 [U. S. Comp. St. Supp. 1907, p. 918]) subjecting railroads to a penalty for knowingly and willfully failing to obey such act, the words "knowingly and willfully" do not require an evil intent, but only that defendant should have failed to obey the statute purposely and with knowledge of the facts.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 37.*]

6. PENALTIES (§ 33*)—BURDEN OF PROOF—PENAL ACTION.

The rules as to the burden of proof with reference to allegations setting up the negative in penal suits, so far as applicable to this case, explained and applied.

[Ed. Note.—For other cases, see Penalties, Cent. Dig. § 32; Dec. Dig. § 33.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

7. EVIDENCE (§ 154*)—DOCUMENTS—ADMISSIBILITY—MANNER OF PROCUREMENT.

  As a general rule papers which are in fact in court may be used in evidence, even though the party offering them procured them illegally, so that papers produced by counsel for one party pursuant to an irregular order of the court, made at the instance of the adverse party, may be introduced in evidence by the latter.

  [Ed. Note.—For other cases, see Evidence, Cent. Dig. § 443; Dec. Dig. § 154.*]

8. CARRIERS (§ 37*)—INTERSTATE CARRIERS OF LIVE STOCK—STATUTORY REGULATIONS—PENALTY FOR VIOLATION.

  Where a railroad train carried a number of different consignments of live stock, and the company failed to unload any of them for rest, ∖ ter, and feeding, as required by the 28-hour law (Act June 29, 1906, c. 3594, 34 Stat. 607 [U. S. Comp. St. Supp. 1907, p. 918]), it became subject to a penalty thereunder for each consignment.

  [Ed. Note.—For other cases, see Carriers, Cent. Dig. § 927; Dec. Dig. § 37.*]

In Error to the District Court of the United States for the District of Massachusetts.

George L. Mayberry (George P. Furber, on the brief), for plaintiff in error.

Asa P. French, U. S. Atty., and William H. Garland, Asst. U. S. Atty.

Before COLT, PUTNAM, and LOWELL, Circuit Judges.

PUTNAM, Circuit Judge. This was an action of contract commenced in the district of Massachusetts, and, therefore, governed by the Massachusetts practice, which makes it equivalent to an action of debt for a statutory penalty. The verdict was for the United States, whereupon the respondent took out this writ of error. The suit was based on Act June 29, 1906, c. 3594, 34 Stat. 607 (U. S. Comp. St. Supp. 1907, p. 918), of which the essential sections are the first, second, and third, as follows:

"Section 1. That no railroad, express company, car company, common carrier other than by water, or the receiver, trustee, or lessee of any of them, whose road forms any part of a line of road over which cattle, sheep, swine, or other animals shall be conveyed from one state or territory or the District of Columbia, into or through another state or territory or the District of Columbia, or the owners or masters of steam, sailing or other vessels carrying or transporting cattle, sheep, swine, or other animals from one state or territory or the District of Columbia into or through another state or territory or the District of Columbia, shall confine the same in cars, boats, or vessels of any description for a period longer than twenty-eight consecutive hours without unloading the same in a humane manner, into properly equipped pens for rest, water, and feeding, for a period of at least five consecutive hours, unless prevented by storm or by other accidental or unavoidable causes which cannot be anticipated or avoided by the exercise of due diligence and foresight: Provided, that upon the written request of the owner or person in custody of that particular shipment, which written request shall be separate and apart from any printed bill of lading, or other railroad form, the time of confinement may be extended to thirty-six hours. In estimating such confinement, the time consumed in loading and unloading shall not be considered, but the time during which the animals have been confined without such rest or food or water on connecting roads shall be included, it being the intent of this act to prohibit their continuous confinement

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

beyond the period of twenty-eight hours, except upon the contingencies hereinbefore stated: Provided, that it shall not be required that sheep be unloaded in the nighttime, but when the time expires in the nighttime in case of sheep the same may continue in transit to a suitable place for unloading, subject to the aforesaid limitation of thirty-six hours.

"Sec. 2. That animals so unloaded shall be properly fed and watered during such rest either by the owner or person having the custody thereof, or in case of his default in so doing, then by the railroad, express company, car company, common carrier other than by water, or the receiver, trustee, or lessee of any of them, or by the owners or masters of boats or vessels transporting the same, at the reasonable expense of the owner or person in custody thereof, and such railroad, express company, car company, common carrier other than by water, receiver, trustee, or lessee of any of them, owners or masters, shall in such case have a lien upon such animals for food, care, and custody furnished, collectible at their destination in the same manner as the transportation charges are collected, and shall not be liable for any detention of such animals, when such detention is of reasonable duration, to enable compliance with section one of this act; but nothing in this section shall be construed to prevent the owner or shipper of animals from furnishing food therefor, if he so desires.

"Sec. 3. That any railroad, express company, car company, common carrier other than by water, or the receiver, trustee, or lessee of any of them, or the master or owner of any steam, sailing, or other vessel who knowingly and willfully fails to comply with the provisions of the two preceding sections shall for every such failure be liable for and forfeit and pay a penalty of not less than one hundred nor more than five hundred dollars: Provided, that when animals are carried in cars, boats, or other vessels in which they can and do have proper food, water, space, and opportunity to rest, the provisions in regard to their being unloaded shall not apply."

There are several counts in the declaration, of which we need quote only one, as follows:

"And the plaintiff says that the defendant is a railway corporation duly established and existing under the laws of the state of New York, and at the times hereinafter mentioned was the lessee of the Boston & Albany Railroad Company, a railway corporation and common carrier engaged in the transportation of cattle from one state to another in the United States: that is to say, from Albany, in the state of New York, to Boston, in the commonwealth of Massachusetts.

"And the plaintiff says that the defendant on the twenty-seventh day of January, A. D. 1907, at Albany, in the state of New York, did load upon one of its cars, known as 'N. Y. C. Car, No. 23316,' certain cattle, to wit, twenty-two cows and forty-nine calves, consigned by George N. Smith, of said Albany, to the order of the said Smith, at said Boston; that said car was fully loaded with said cattle at three o'clock in the afternoon of said day, and said car containing said cattle was conveyed by the defendant from said Albany over the line of said Boston & Albany Railroad Company to said Boston, where it arrived on the twenty-ninth day of said January at nine o'clock and thirty minutes in the forenoon; that during the period of time in which said cattle were in transit as aforesaid, and for a period of more than twenty-eight consecutive hours—that is to say, for a period of forty-two hours and thirty minutes—the defendant did knowingly and willfully fail to unload said cattle from said car for rest, water, or feeding, and did knowingly and willfully fail and neglect to feed or water said cattle.

"And the plaintiff says that the defendant was not prevented by storm, or by other accidental or unavoidable cause which could not be anticipated or avoided by the exercise of due diligence or foresight, from unloading said cattle from said car, or from feeding or watering said cattle as required by law; that said car was not one in which said cattle had proper food, water, space, or opportunity to rest: and that no written request was then or theretofore made by the owner, or any person in custody of said shipment of cattle, that the time of confinement of said cattle might be extended from twenty-eight hours to thirty-six hours.

"Wherefore, and by reason of the premises, the plaintiff says that the defendant became liable to pay to the plaintiff the penal sum of five hundred dollars, in accordance with the provisions of the statutes of the United States in such cases made and provided, and plaintiff prays judgment for said sum and for its costs."

Several questions of pleading were raised by the defendant below, now the plaintiff in error. The first attempt to raise them was by a motion to dismiss. This was overruled; and, as it was an inartificial method of pleading, the court might in its discretion strike it out or overrule it, so that its action laid no basis for a writ of error. Even under the Massachusetts practice acts the demurrer is retained, with the requisition that the causes of the demurrer be specifically assigned, and that no mere defects of form may be so assigned. Rev. Laws, c. 173, §§ 13, 14.

Subsequent to the verdict a motion in arrest of judgment was filed, specifying all the topics which we will consider, and perhaps some others. As we understand, this is not known in the Massachusetts practice in civil cases; but this is not of any consequence, because, whatever might, under the common-law practice, be thus assigned, would be good on a writ of error. It must be remembered, however, that a verdict cures many defects at common law and under the statutes of jeofails. Independently of what is found at common law and under the statutes of jeofails, section 954 of the Revised Statutes of the United States (U. S. Comp. St. 1901, p. 696) provides:

"No summons, writ, declaration, return, process, judgment, or other proceedings in civil causes, in any court of the United States, shall be abated, arrested, quashed, or reversed for any defect or want of form; but such court shall proceed and give judgment according as the right of the cause and matter in law shall appear to it, without regarding any such defect, or want of form, except those which, in cases of demurrer, the party demurring specially sets down, together with his demurrer, as the cause thereof."

Consequently, as there was no demurrer, no mere matter of form can be taken advantage of at the present stage of the litigation.

The statute on which the suit was based is quite inartificially drawn. In the first section it enumerates the "lessee." The natural and just presumption would be that the statute is aimed at the corporation actively operating the road over which the transportation occurs, whether it is the lessee or not; but it is plain that it assumes that the lessee would necessarily be such active operator. The first objection to the declaration rests on the fact that it does not discriminate clearly in reference to this particular; but it follows the language of the statute, and certainly, after verdict, must be held to be sufficient.

Then, again, the statute uses the words "confine the same," which are not precisely found in this declaration. Nevertheless these words do not relate to the real pith of the offense, which is found in what follows, namely: "Without unloading the same in a humane manner, and into properly equipped pens for rest, water, and feeding." Force is not to be attached to these words to such an extent as to hold that they mean anything more than ordinary transportation of cattle in the ordinary railroad cars used for that purpose. While the declaration omits the word "confine," it expressly states that the cattle were

loaded in such cars, and that they were "fully loaded with such cattle," and were "conveyed by the defendant" from Albany to Boston "over the line of" the corporation described as the lessee. As it was not required that the pleader should anticipate the proviso in the third section of the act, this clearly describes all the confinement to which the statute relates; and, as this substitution for a particular word named in the statute of other words having the same effect is not a lawful ground of objection, especially after verdict, the requirements of the law in this particular are fully complied with.

The defendant below also objects because the declaration alleges that it failed to unload the cattle "for rest, water, or feeding," and it claims that, if the cattle were unloaded for any purpose, that would be sufficient; but the statute in this particular is express, and the allegations of the declaration conform strictly to it. Some comment is also made upon the expression in the first count, as follows: "Did knowingly and willfully fail and neglect to feed or water said cattle." It is said that this is an offense only under the second section of the statute, which is true. It is also true that there is not sufficient in these words to properly describe an offense under that section. As the count properly declared an offense under the first section, they might have been stricken out as surplusage; but, as no motion therefor was made, they became immaterial matter.

The result is that, so far as any questions of pleading are urged on us, they need not be considered further than they have been.

The statute enumerates some matters which might excuse the defendant if they had been proven. A portion of them—that is, so much as relates to storms and other accidental or unavoidable causes—are incorporated into the first sentence of the first section, and are therefore necessary to be alleged. Others are incorporated into a proviso which forms a clearly separate topic, as much as though they appeared in a distinct section. Therefore it was not necessary for the United States to negative them. All these propositions are covered by Chitty on Pleading, *246, *247. The plaintiffs offered evidence from the records of the Weather Bureau that there was no storm. They offered no proof, however, bearing on the "other accidental or avoidable causes" named in the statute.

Penal actions are for some purposes criminal in their nature, so that they are subject to certain provisions of the Constitution of the United States with reference to constitutional guaranties; yet, so far as the ordinary rules of pleading and proof are concerned, a suit like this is to be regarded as merely a civil proceeding. This was understood to be the law even before the ruling of Lord Kenyon in Wilson v. Rastall (1792) 4 D. & E. 753, 758. This was in a qui tam suit. There had been a verdict for the defendant. Thereupon the plaintiff moved for a new trial. Of course, if the case was a criminal one strictly, there could be no new trial, under the English practice or under the Constitution of the United States. Lord Kenyon said:

"All cases of indictments I lay out of the case, because they are criminal cases, and are exceptions to the general rule; but I consider this as a civil action."

The rule of this case is stated in Dane's Abridgement, vol. 5, p. 243, which is sufficient authority for the law in the United States at the beginning of the last century. The same rule was stated in Watertown v. Draper, 4 Pick. (Mass.) 165. The origin of this ruling will be found in the earlier case of Atcheson v. Everitt, Cowper, 382, 387, decided in 1776. There the question came directly in issue. At page 383, Lord Mansfield thought that, under the law as it then stood, where an action and an indictment both lie for the same act, "a Quaker is an admissible witness in the action, although not on the indictment." The then statute, as he said, made "an exception to their being admitted as witnesses in criminal causes." He said that till that time it had not been decided whether they were admissible in actions for penalties; that is to say, whether actions for penalties were "criminal causes" or not. He observed:

"There being no case in point, it is a material circumstance that actions for penalties are to a variety of purposes considered as civil suits. They may be amended at common law. To be sure, the action in this case is not only given to recover a penalty; but it is attended likewise with disabilities. Therefore it partakes much of the nature of a criminal cause. Moreover, the offense itself is not merely malum prohibitum by statute, but it was indictable at common law."

Then, referring to the question of admissibility of the oaths of Quakers, he concluded:

"But how the law is in respect to this particular case I am at present not at all decided in my opinion.

The point came up again on reargument, as appears by Lord Mansfield's opinion, commencing on page 388. On page 391 he concluded that the proceeding was not a criminal one, but "as much a civil action as an action for money had and received."

This case was on a motion for new trial in the King's Bench, and, as is plain, it was very carefully considered, and the judgment was concurred in by all the judges. Therefore, in view of Atcheson v. Everitt and the other authorities cited, we must agree that, both in the United States, subject to the limitations we have stated, and in England, the present proceeding is held to be "as much a civil action as an action for money had and received," using the language of Lord Mansfield. While, as we have said, certain guaranties of the Constitution apply, none of them touch any of the questions involved which are raised by the plaintiff in error; and the rules of pleading and procedure and evidence for this suit are those which apply to an ordinary civil action for debt between private parties.

In order that we may not be misunderstood, we reiterate that certain limitations arise from the application of constitutional guaranties and other peculiarities. We do not presume that in all particulars article 3 of the Constitution, or the amendments (article 5 and article 6), are to be disregarded, even with reference to actions of debt. This is illustrated by Lees v. United States, 150 U. S. 476, 480, 14 Sup. Ct. 163, 37 L. Ed. 1150. We do not presume that Congress, even by providing a civil action, could avoid a grand jury for infamous offenses, or could violate the guaranty against self-impeachment. So, also, civil suits for penalties must be prosecuted in the court of sov-

ereignty imposing the penalty, as decided in Wisconsin v. Pelican Insurance Company, 127 U. S. 265, 8 Sup. Ct. 1370, 32 L. Ed. 239, although held otherwise in Massachusetts; and, until procedure has ripened, even qui tam actions are within the pardoning jurisdiction of the executive. Huntington v. Attrill, 146 U. S. 657, 673, 13 Sup. Ct. 224, 36 L. Ed. 1123. Notwithstanding such exceptional distinctions and limitations, the conclusions of the Supreme Court, and its reasonings leading thereto, in United States v. Zucker, 161 U. S. 475, 480, 481, 16 Sup. Ct. 641, 40 L. Ed. 777, where it was held that depositions might be used in penal suits, and in Callan v. Wilson, 127 U. S. 540, 8 Sup. Ct. 1301, 32 L. Ed. 223, and Schick v. United States, 195 U. S. 65, 24 Sup. Ct. 826, 49 L. Ed. 99, permit the application here of the general rules of practice, procedure and evidence.

Under these circumstances, it follows that the United States were bound to support their case before us by only a preponderance of the evidence; but a question arises whether the burden primarily rested on them as to those portions of section 1 of the statute in question which precede the word "provided." They offered evidence about prevention by storm, sufficient according to the authorities to sustain themselves so far as that is concerned; and, perhaps, so far as that is concerned, they were bound to offer some evidence, because that was a matter of general information as to which they could do this without difficulty.

Regarding, however, the question of "other accidental or unavoidable causes," we are of the opinion that the burden rested primarily on the defendant. In his work on Criminal Evidence (9th Ed., § 319 et seq.), Mr. Wharton admits that the weight of the authorities is in favor of the rule, not only in civil cases, but at least to a certain extent in criminal cases, that a negative proposition, although required to be pleaded, must generally be first met by proof from the defendant. This is so stated in Greenleaf's Evidence, § 74. Of course, it is otherwise where the negative allegation is a fundamental part of the offense in a criminal case or of the claim in a civil suit. This is shown by Mr. Greenleaf in section 78, and is illustrated in suits for malicious prosecution, and in some cases of suits for statutory penalties, instances of which are given by Mr. Greenleaf. On this topic, however, we need not go farther than Colorado Coal Company v. United States, 123 U. S. 307, 318, 319, 8 Sup. Ct. 131, 31 L. Ed. 182, which fully sustains our propositions. Of course the rule ab inconvenienti has application to a very considerable extent. Here, as to the matter of "accidental or unavoidable causes which cannot be anticipated or avoided by the exercise of due diligence and foresight," the rule of inconvenience applies in favor of the United States, because such causes might easily have been shown by the defendant below, while the method in which transportation by railroad corporations is done over long distances is such that it is quite impossible for those who do not accompany trains to prove what the particular circumstances are.

What we have said, if we are correct, determines also against the plaintiff in error its claim that the United States were bound to establish their propositions beyond a reasonable doubt. The only thing

we have found that may be considered to question this are certain expressions in Chaffee & Company v. United States, 18 Wall. 516, 544, 545, 546, 21 L. Ed. 908; but, wherever that opinion uses the expression "reasonable doubt," it will appear on a careful examination that it originated in the Circuit Court, and was never affirmed by the Supreme Court as suitable. All the Supreme Court decided was in reference to the obligation of the defendants in the litigation there to meet a prima facie case; and the opinion therefore observed, very justly and wisely, that the rule of the Circuit Court justified the criticism "that it substantially withdrew from the defendants their constitutional right of trial by jury, and converted what at law was intended for their protection—the right to refuse to testify—into the machinery for their sure destruction." It is true that here the Supreme Court, as it has done everywhere, recognized the fact that the suit in that case, though civil in form, was so far criminal that the constitutional guaranty against self-crimination remained, as we have already pointed out is the fact. On the other hand, the rule of the preponderance of the evidence in qui tam actions was applied in Roberge v. Burnham, 124 Mass. 277, on careful consideration. This was a qui tam action, and, under the decisions of the Supreme Court, is of some authority in the federal courts in the district of Massachusetts.

We may also, in this connection, dispose of some suggestions made by the plaintiff in error, not thoroughly explained to us, to the effect that on some parts of the case testimony was lacking. In view of the facts we have stated, no testimony required to make out the case on every point, even beyond a reasonable doubt, was lacking, unless it be as to the matter of storms, which is a negation; so that the United States, as we have said, offered all the proofs required, either in criminal or civil proceedings, to make out a sufficient case until met by some contradictory matter.

The authorities relied on by the plaintiff in error to contravene any of our propositions with regard to either pleadings or the rules of evidence are to some extent not of sufficient weight to bind us, and to some extent do not apply to the conditions of this case, and for the rest they sustain what we have said, rather than contradict it. For example, Commonwealth v. Thurlow, 24 Pick. (Mass.) 374, 380, 381, in an opinion by Chief Justice Shaw, fully recognizes the distinction between the proof of affirmative allegations and the proof of negative allegations, and the force of the rule ab inconvenienti even as applied to criminal proceedings.

As bearing, however, on our propositions as to the rules of procedure which we have stated, the plaintiff in error calls our attention to the words "knowingly and willfully" in the third section of the act on which this proceeding is based. These words do not appear in the first section; but the third section imposes a penalty only where the corporation or person charged "knowingly and willfully fails to comply with the provisions" of the first section. "Knowingly and willfully fails," which is about equivalent to "willfully neglects," is a combination not treated of in the authorities, and means undoubtedly the same as "willfully omits"; but, independently of

any verbal criticisms, we do not perceive the effect of the propositions of the plaintiff in error in this connection. The word "willfully" is sometimes used in statutes and indictments, and sometimes omitted from them, for very differing reasons. In order that there shall be a punishable evil intent, the criminal law ordinarily requires that there shall be a knowledge of the facts, and when with a knowledge of the facts is combined an injurious result which the actor foresaw, or might reasonably have foreseen, all the law ordinarily implies by the words "willfully" is accomplished. Nevertheless, there are numerous phases of the law where a knowledge of all the facts involved is not required, arising, for example, with reference to questions of adultery and incest, and under statutes in regard to sales of liquors to minors, and the pure food laws, etc. Therefore sometimes, to guard against any possible inference of criminality in the absence of knowledge, the word "willfully" is inserted in the statutes; and sometimes it is inserted for other reasons. In Potter v. United States, 155 U. S. 438, 446, 15 Sup. Ct. 144, 39 L. Ed. 214, the Supreme Court seemed to be of the opinion, because the word "willfully" was inserted with reference to offenses denounced in the earlier portion of a certain section, and omitted with reference to offenses denounced in a later part, that it could not be regarded as mere surplusage, and that it implied, not only knowledge, "but a purpose to do wrong," thus giving to it peculiar force. In connection with this decision the expressions of the Supreme Court as to the word "willfully" must be regarded as somewhat confusing. However, in the later cases the court has held, in reference to this word "willfully," that a mere lack of knowledge of the law and intent not to violate the law were not sufficient to escape the statute denouncing the offense, if there was full knowledge of the facts. The case particularly relied on by the plaintiff in error (Yates v. Bank, 206 U. S. 158, 180, 27 Sup. Ct. 638, 51 L. Ed. 1002), summing up previous cases, merely distinguishes between negligence and the violation of a statute knowingly. The latest pronouncement of the Supreme Court is found in Armour Packing Company v. United States, 209 U. S. 56, 85, 86, 28 Sup. Ct. 428, 52 L. Ed. 681, where it was entirely clear that the Armour Packing Company was proceeding, not only according to what it believed to be the law, but according to such a construction thereof that at least three justices sustained it. This involved a statute which contained the word "willfully," and yet it appears at page 86 of 209 U. S., and page 437 of 28 Sup. Ct. (52 L. Ed. 681), that a knowledge of the facts was all the evidence of guilty intent which the act required. The Circuit Court of Appeals for the Eighth Circuit, in Chicago Ry. Co. v. United States, 162 Fed. 835, has so thoroughly expounded the law and the decisions of the Supreme Court so far as this topic is concerned that we need not follow them further for the purpose of showing, as applied to a case of this character and to allegations such as we have here, that the words "knowingly and willfully," on which the plaintiff in error relies, are of no consequence in this particular case.

However, independently of that fact, we are unable to find anything here to benefit the plaintiff in error, because, if the words "knowingly and willfully" require anything additional in order to make out the case of the United States, what is required would be additional facts to be proved, leaving unchanged with reference to those additional facts the propositions we have already stated.

The plaintiff in error relies on an occurrence at the trial as follows: William Waterman, called by the United States, testified that he was at the times in issue agent of the New York Central Railroad Company at Brighton, and that as such he received waybills of merchandise coming from New York, and that he had been summoned to produce certain waybills, but that he did not have them in his possession. The United States then put in evidence the subpœna, which was in sufficient form. The witness then resumed his testimony, admitting that he had been served with the subpœna, and that he had not produced the documents because they had been turned over by him to the persons connected with the legal department of the plaintiff in error. The following occurred, as shown by the record:

"Thereupon counsel for the defendant stated, in answer to an inquiry by the court, that he had in his possession in court the papers referred to in the subpœna, but objected to being required to produce them upon the sole ground that this was in its nature a criminal proceeding and that the defendant could not lawfully be required to produce evidence against itself. The court, upon the request of the district attorney, ordered the counsel for the defendant to produce the said papers for the use of the plaintiff as evidence in the case. To this order the defendant then and there duly excepted, and the exception was duly noted.

"All the waybills called for in the aforesaid subpœna were then produced by counsel for the defendant in compliance with the order of the court, and the testimony of the witness was resumed as follows:

" 'These waybills [the ones so produced] were at some time in my custody as agent of the New York Central at Brighton. They are the same documents which I turned over on September 30th last to the legal department. They are seven waybills covering shipments of merchandise over the New York Central Railroad from West Albany to Brighton.'

"The plaintiff then offered the said waybills in evidence, and the defendant objected to their admission, stating the ground of his objection to be that the documents themselves were mere waybills, not proved or authenticated in any such way as to make the facts that they purported to state competent evidence against the defendant in this case. The United States attorney stated that he would show that the waybills in question referred to the transactions concerning which penalties were sought to be recovered by the plaintiff. The court admitted the said waybills against the defendant's said objection, and the defendant then and there duly excepted, and its exception was duly noted."

According to the usual practice, the defendant below might have refused to produce the papers, and this would have given the right to the United States to prove their contents by secondary evidence, but would have had no other result. On the court's ordering the production of the papers, the order was not refused; but, if not complied with, it might have been followed by an attempt to punish for contempt, which would have enabled the issue to be raised directly on habeas corpus. Therefore, in any view, it might be questioned whether or not, after all, the production of the waybills was not purely voluntary. In these respects the case is different entirely

from Boyd v. United States, 116 U. S. 616, 6 Sup. Ct. 524, 29 L. Ed. 746, where the statute which was held to be unconstitutional provided that, if the papers were not produced, the nonproduction would be a confession of the allegations which it was pretended they would prove. In that case the papers were, under the circumstances, produced, and the court held the statute unconstitutional, and not only so held, but that the use of the papers at the trial, under the circumstances, furnished a ground of a valid exception.

Notwithstanding Boyd v. United States, the usual rule is that, where papers are in fact in court, they may be used in evidence, even though the party who offers them in evidence procured them illegally. Adams v. New York, 192 U. S. 585, 24 Sup. Ct. 372, 48 L. Ed. 575, and other cases. Indeed, independently of any particular decisions, such has always been understood to be the rule. Under the circumstances of this case, however, it is very evident that the United States might have issued a subpœna to counsel of the defendant, requiring production of the papers; so that, in view of all the facts, it must be held that such a subpœna was waived, and it cannot be fairly ruled that the rights of the plaintiff in error are any other than they would have been if the papers had been produced in response to one. Considering that the papers were produced by counsel who were not charged with any offense, and that the suit was against a corporation, we are quite sure, from Adams v. New York, already cited, including the review therein of Boyd v. United States, at page 598 et seq. of 192 U. S., page 375 of 24 Sup. Ct. (48 L. Ed. 575), and from Interstate Commerce Commission v. Baird, 194 U. S. 25, 24 Sup. Ct. 563, 48 L. Ed. 860, and Hale v. Henkel, 201 U. S. 43, 26 Sup. Ct. 370, 50 L. Ed. 652, that the plaintiff in error received no legal prejudice from the ruling on this particular point.

In this connection we refer to the fact that the plaintiff in error claims that the waybills themselves were not competent evidence in any view, on the ground, apparently, that they were of a secondary character; but according to the usual practices in connection with the transportation of merchandise over long distances, which are so common that we are entitled to take notice of them, it must be held that they were not only admissions such as the law holds may be made by agents in connection with acts done by them in performance of their duties, but that they were also in fact such acts themselves.

It seems that in one or more of the trains on which the cattle were transported there were several consignments; and, in imposing the penalty, the learned judge of the District Court held that each consignment was a unit under the statute. Undoubtedly the statute is capable of a construction more favorable to the plaintiff in error; but there is so much doubt about it that we see no reason for departing from our usual practice, which leads us to follow the decision of the Circuit Court of Appeals for the Sixth Circuit in United States v. Baltimore R. Co., 159 Fed. 33, 86 C. C. A. 223, in harmony with the ruling of the District Court in this particular.

It is possible there may be some propositions made by the plain-

tiff in error which we have not noticed, but we are confident there are none which require special attention.

The judgment of the District Court is affirmed.

NOTE BY THE COURT.—Since this opinion came to hand we have received the opinions in Montana Central v. United States (C. C. A.) 164 Fed. 400, and Hardesty v. United States (C. C. A.) 164 Fed. 420, which are in harmony with our views as to the rule with reference to the use of the waybills and also as to our proposition that, for the most part, the nature of this proceeding is civil, instead of criminal.