OREGON–WASHINGTON R. & NAV. CO. v. UNITED STATES.

(Circuit Court of Appeals, Ninth Circuit.    May 21, 1913.)

No. 2,237.

**1. CARRIERS (§ 37*)—TRANSPORTATION OF ANIMALS—28-HOUR LAW—"KNOWINGLY AND WILLFULLY"—"WILLFULLY."**

The words "knowingly and willfully," as employed in the 28-hour law (Act June 29, 1906, 34 Stat. 607, c. 3594 [U. S. Comp. St. Supp. 1911, p. 1341]), prohibiting carriers from confining animals in cars without unloading for food, water, and rest for a period longer than 28 hours, or 36 hours in case of release, means with a knowledge of the facts which, taken together, constitute a failure to comply with the statute purposely or obstinately; the word "willfully" being designed to describe the attitude of a carrier who, having a free will or choice, either intentionally disregards the statute or is plainly indifferent to its requirements.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 95, 927; Dec. Dig. § 37.*

For other definitions, see Words and Phrases, vol. 5, p. 3939; vol. 8, pp. 7468–7481.]

**2. CARRIERS (§ 37*)—TRANSPORTATION OF ANIMALS—28-HOUR LAW—VIOLATION—QUESTION FOR JURY.**

In an action against an interstate carrier to recover a penalty for violation of the 28-hour law (Act June 29, 1906, 34 Stat. 607, c. 3594 [U. S. Comp. St. Supp. 1911. p. 1341]) by holding animals in cars longer than 36 hours, whether the carrier knowingly and willfully confined the animals in the car in excess of the time limit, and whether such withholding was due to accident or unavoidable mistake of the carrier, under the belief that the caretaker in charge would attend to the unloading, *held* for the jury.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 95, 927; Dec. Dig. § 37.*]

**3. CARRIERS (§ 37*)—TRANSPORTATION OF ANIMALS—28-HOUR LAW—STOCK IN CHARGE OF CARETAKER—DUTY OF CARRIERS.**

Since the 28-hour law (Act June 29, 1906, 34 Stat. 607, c. 3594 [U. S. Comp. Supp. 1911, p. 1341]) imposes on an interstate carrier, transporting live stock, the primary duty of seeing that the stock is not confined in the cars longer than the prescribed period, the carrier cannot shift the burden and responsibility for unloading in time on the shipper by agreement with it; and hence, where animals were transported in charge of a caretaker, the fact that he notified the carrier's conductor that he would notify the consignee, who would care for the stock, did not relieve the carrier of the duty of exercising reasonable diligence and foresight, after the car had been spotted at the stockyards, to see that the animals were unloaded within that time.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 95, 927; Dec. Dig. § 37.*

Liability of carrier for failure to feed, water, and rest live stock, and for violation of 28-hour law (Act June 29, 1906, 34 Stat. 607, c. 3594 [U. S. Comp. St. Supp. 1911, p. 1341]), see note to St. Joseph Stock Yards Co. v. United States, 110 C. C. A. 435.]

In Error to the District Court of the United States for the Northern Division of the District of Idaho; Frank S. Dietrich, Judge.

Action by the United States against the Oregon-Washington Railroad & Navigation Company to recover a penalty for violating the

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

205 F.—22

28-hour law. Judgment for the United States, and defendant brings error. Affirmed.

A. C. Spencer, of Portland, Or., and Hamblen & Gilbert, of Spokane, Wash.; for plaintiff in error.

C. H. Lingenfelter, U. S. Atty., of Boise, Idaho.

Before GILBERT and MORROW, Circuit Judges, and WOLVERTON, District Judge.

WOLVERTON, District Judge. This is an action by the government against the Oregon-Washington Railroad & Navigation Company, under the 28-hour law, to recover a penalty for confining a consignment of hogs in a car while in transit for more than 36 hours without unloading in a humane manner. The only question presented for determination arises upon a motion made at the close of plaintiff's testimony for a nonsuit, and another at the close of all the testimony for a directed verdict in favor of the defendant.

The hogs were consigned by John Daubert, as shipper, to Mahoney Bros., Wallace, Idaho. Mahoney Bros. had stockyards of their own, situated from a mile to two miles from the yards of the defendant, but on a branch line of the Northern Pacific Railway Company, so that at Wallace the Oregon-Washington Railroad & Navigation Company delivered stock consigned to Mahoney Bros. to the Northern Pacific Railway Company, and that company delivered to the consignees at their yards.

The testimony adduced by the plaintiff tended to show that the hogs were loaded at Endicott at 11:30 a. m., and arrived at Wallace the next day at about 8 p. m.; that they were not then unloaded, but remained in the car until the following morning, when they were unloaded at the Mahoney Bros.' yards at 8 o'clock having on that morning been transferred to the Northern Pacific Railway Company for delivery at the stockyards of Mahoney Bros. John Daubert, who accompanied the hogs as caretaker, testified that on the arrival of the car in Wallace he left it, and notified Mr. Mahoney of its arrival, and was told by him that he would take care of it, and witness did not subsequently know what was done with the hogs. He further testified that he told the conductor on the train to spot the car in the stockyards, and the conductor gave his word that he would do so. Mahoney was further advised that he (witness) had signed a 36-hour release, and that the time for unloading the hogs would expire about 9 o'clock that evening, and Daubert relied upon Mahoney Bros.' statement that they would look after the shipment. There was further testimony showing that, after the car reached Wallace, it was spotted at the defendant's stockyards, and was seen standing in the same position the next morning, at about 6 o'clock, without having been unloaded. The car was delivered to Mahoney Bros. about 7:40, and unloaded at 8.

The government having rested its case, the defendant introduced evidence tending to show that the conductor while en route told Daubert that immediately upon the arrival of the car at Wallace it would be spotted, and asked him whether he would unload the stock, but

that Daubert told him he would be done with it upon its arrival at Wallace, but would find Mahoney Bros. and see that they attended to it, and that the first thing the conductor did after the arrival of the train was to put the car at the track pen so that it could be unloaded. The conductor saw the car again about 10 o'clock at night, and it was still standing where he spotted it. He further explained that they did not unload the stock at the time, because Daubert was in charge of it and said he was going to notify Mahoney to unload it. The conductor knew furthermore that Daubert abandoned the car, and that unless some one arrived there that night the stock would remain loaded until the next morning. The station agent knew when the car arrived in the evening, and testified:

"Our closing hours are 6 o'clock, but I waited around until the conductor of 94—I waited for him to come to the depot, after he arrived at the lower yards, to ascertain whether or not any effort had been made to take care of the shipment, for the express purpose of keeping away from violating the 36-hour law, and when he arrived I asked him about it. He told me that the car of stock had a man in charge, Mr. John Daubert, and Mr. Daubert was going to notify Mahoney Bros., consignees, to look after the car; so long as the man was in charge of the car I considered the car would be taken care of. I did not find out the car had not been unloaded until the following morning about 8 o'clock."

Two questions are involved by the controversy. They are: First, whether the government has made such a case as entitled it to go to the jury upon the testimony touching whether the defendant knowingly and willfully confined the hogs in the car in excess of the 36 hours; and, second, whether the defendant has shown, by indubitable proof, and about which there cannot reasonably be two opinions, that it should be excused for the delay incident to unloading, for such excuse is a matter of defense, and the burden was with the defendant to establish it.

[1] The carrier who knowingly and willfully fails to comply with the provisions of the act is amenable thereto, and in the present case it was incumbent upon the government to show by testimony sufficient to go to the jury that the defendant did so knowingly and willfully fail to unload the hogs within the period of 36 hours. The words "knowingly and willfully," as employed in the act, have been many times construed and their meaning determined. "Knowingly" signifies "with a knowledge of the facts which, taken together, constitute the failure to comply with the statute"; and "willfully" means "purposely or obstinately, and is designed to describe the attitude of a carrier who, having a free will or choice, either intentionally disregards the statute or is plainly indifferent to its requirements." Such is the interpretation given by Mr. Justice Van Devanter while a member of the Circuit Court of Appeals of the Eighth Circuit. St. Louis & S. F. R. Co. v. United States, 169 Fed. 69, 71, 94 C. C. A. 437, 439. The same court in another case, in an opinion rendered by Adams, Circuit Judge (United States v. Union Pac. R. Co., 169 Fed. 65, 67, 94 C. C. A. 433, 435), defines the word "willfully," not as implying a vicious or evil intent, but the "intentional doing of an act forbidden by the statute." This view of the significance of the word

is followed in a still later case from the same circuit. Chicago, B. & Q. R. Co. v. United States, 194 Fed. 342, 114 C. C. A. 334. See, also, New York Cent. & H. R. R. Co. v. United States, 165 Fed. 833, 91 C. C. A. 519.

[2] With this understanding of these terms, it seems free from doubt that the evidence was sufficient upon which to carry the case to the jury. We may not stop to inquire whether it was sufficient at the time when the nonsuit was asked, as it was clearly sufficient when the case was closed. The evidence of the conductor and station agent, witnesses introduced by the defendant, was sufficient for that. The conductor knew the car was spotted, and that its unloading depended upon the notification of the consignees by the caretaker and the doing of the work by them, and the agent considered that so long as the caretaker was in charge of the car the stock would be taken care of. The car was left, therefore, where spotted, upon the presumption that the consignees would unload the stock. At this time there had been no delivery by the company to the consignees, or to the Northern Pacific Railway Company for transfer to the stockyards of the consignees.

The statute imposes upon the carrier the primary duty of seeing that the stock is not confined in cars longer than the prescribed period, for the command of the statute is, "Thou shalt not" fail to do the thing required; and, while the carrier may arrange with the shipper or the person in charge for unloading, the company cannot thereby shift the burden, and the responsibility for unloading in time still rests with it. The company, therefore, having knowledge of the attending conditions, which intentionally disregards the statute, or is purposely indifferent to its behests, is rendered amenable thereto. There was ample evidence adduced upon which to submit the cause to the jury upon this phase of the controversy.

[3] As to the other phase of the controversy, the statute renders the carrier excusable for confining the stock in cars more than the prescribed period of time, if prevented from unloading "by storm or other accidental or unavoidable causes which cannot be anticipated or avoided by the exercise of due diligence and foresight." The question, we must assume, was left to the jury to determine whether the delay was caused through accident or unavoidable cause, and whether the defendant exercised due diligence and foresight in any endeavor to prevent the delay. The stock, as previously observed, was not delivered to the consignees. It is claimed the officers and agents of the company left the stock, when the car was spotted, in charge of Daubert, the caretaker, and that it was not known to them why he failed and neglected to care for it. Whether the claim, if supported by the evidence, would constitute a defense or not, we need not now determine. The matter was left to the jury, and properly so, for the evidence falls far short of that convincing character which renders it incumbent upon the court to direct a verdict for the defendant. The servants of the defendant might have assumed that the car would be taken care of, but that was not enough. Being responsible for the unloading, they should have at least exercised due diligence and fore-

sight in the premises, and the question whether they did or not was for the jury. The evidence was sufficient for the consideration of the jury, and, being sufficient, it became their sole function to determine the fact.

Affirmed.