UNITED STATES v. CHICAGO, ST. P., M. & O. RY. CO.

(District Court, N. D. Iowa, W. D.   September 18, 1917.)

No. 162.

1. CARRIERS ⬤=37—CARRIAGE OF LIVE STOCK—ACTION FOR PENALTY—BURDEN OF PROOF.

Under Twenty-Eight Hour Law June 29, 1906, c. 3594, 34 Stat. 607 (Comp. St. 1916, §§ 8651–8654), declaring that no railroad or common carrier other than by water shall knowingly and willfully confine any cattle or other animals for a period longer than 28 consecutive hours without unloading the same for rest, water, and food for a period of .at least 5 hours, unless prevented by storm, or by accidental or other unavoidable cause, which could not be anticipated or avoided by due diligence and foresight, but that on written request of the owner or person in custody of a particular shipment the time of confinement might be extended to 36 hours, the government, suing for the penalty prescribed for violation, must show that the carrier knowingly and willfully confined the shipment of live stock beyond the period prescribed; but, having shown the same, it is incumbent on the carrier to show that its failure to unload the live stock was caused by storm, accident, or other unavoidable causes, which could not have been anticipated or avoided by due diligence.

2. CARRIERS ⬤=37—LIVE STOCK—TWENTY-EIGHT HOUR LAW.

In an action against a railroad company for the penalty prescribed for violating the Twenty-Eight Hour Law, a train dispatcher of another railroad company, whose tracks were used by defendant, must be treated as defendant's agent, where the movement of defendant's trains was governed by such dispatcher.

3. CARRIERS ⬤=37—LIVE STOCK—TWENTY-EIGHT HOUR LAW.

A shipper requested that cattle might be confined for a period of 36 hours without being unloaded. The train on which the cattle were shipped proceeded to within 26 miles of the place where the cattle were to be unloaded. The running time for such 26 miles was about 1½ hours. At that time the cattle had been en route less than 32 hours. The last of the run was made over leased tracks, and the train dispatcher of the lessor company, who directed the movements of such trains, directed the conductor of defendant's train to take a siding at a named station and await the passage of another train. The other train was delayed, and finally, defendant's conductor having communicated with the dispatcher by telephone, was directed to take his train on to the point where the cattle were to be unloaded. Owing to weather conditions, the train had to be cut into sections and brought in one at a time, and for that reason the cattle were confined for more than 36 hours. *Held*, that the carrier was not liable for the penalty, no violation of the Twenty-Eight Hour Law appearing; it not being shown that the carrier willfully and knowingly confined the cattle for more than 36 hours, and it being apparent that the excessive confinement resulted from a storm and other causes over which the carrier had no control.

At Law.   Action by the United States against the Chicago, St. Paul, Minneapolis & Omaha Railway Company to recover from the defendant railway company the penalty provided for an alleged violation of the Twenty-Eight Hour Law, as amended by Act Cong. June 29, 1906, c. 3594, 34 Stat. 607.   Judgment for defendant.

⬤=For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

F. A. O'Connor, U. S. Atty., of New Hampton, Iowa, and Seth Thomas, Asst. U. S. Atty., of Ft. Dodge, Iowa.

Sargent, Strong & Struble, of Sioux City, Iowa, for defendant.

REED, District Judge. On January 31, 1916, some 40 head of cattle were loaded into a car at the Union Stockyards in St. Paul, Minn., at 4:30 o'clock p. m. of that day, to be carried by the defendant, a common carrier by railroad, and its connecting carriers, to Moville, in the state of Iowa. By proper written request of the shipper, the cattle during shipment might be confined for a period of 36 hours without being unloaded for rest, food, and water, as provided by said act of Congress. The car in which said cattle were loaded was delivered to defendant shortly thereafter at South St. Paul, Minn., and was carried by it to Le Mars, a station on its line of road in Iowa. The running time of defendant's train from South St. Paul to Le Mars is not shown by the testimony; but the train arrived at Le Mars on February 1, 1916, in time to have left, and did in fact leave, there at 11:45 p. m. of that day, or 31 hours and 15 minutes after the cattle were loaded at St. Paul. In the absence of delays the train could have made the run from Le Mars to Sioux City, on its way to its destination, a distance of about 26 miles, in 1½ hours, but did not arrive there until February 2, 1916, at about 2:15 a. m., and was not delivered by defendant to its connecting carrier at Sioux City until 6:40 a. m., and the stock was not unloaded until 7:25 p. m. of that day, and was therefore confined without unloading for the required food, water, and rest for nearly 39 hours.

The cause was submitted to the court upon a stipulation of facts, from which it appears: That defendant operates all of its trains from St. Paul, Minn., to Sioux City, Iowa, over the line and road of the Illinois Central Railroad Company (which will be called the Central Company) between Le Mars and Sioux City, under the directions and control of the train dispatcher of the Central Company, who is located at Cherokee, on the line of that company, some 30 miles east of Le Mars. Defendant's train carrying the cattle in question (which was No. 217) left Le Mars at 11:45 p. m. February 1, 1916, with orders to meet and pass train No. 242 of the Chicago & Northwestern Railroad Company (which will be called the Northwestern Company), which also runs over the line and road of the Central from Sioux City to Le Mars, at James station, on the line of the Central Company, some 7 miles north of Sioux City, at which station there was no telegraph or other operator at night. That defendant's train No. 217 passed Wren, a station on the line of the Central Company between Le Mars and James, without further orders; thence proceeded to James, and took the siding there to meet and pass the Northwestern train No. 242, north bound, as it was ordered by the Cherokee dispatcher to do. That after defendant's train had passed the station Wren, the dispatcher of the Northwestern Company at Sioux City arbitrarily ordered the engine of train No. 242 to be sent south of Sioux City, on the line of the Northwestern Company, to bring into said city a train on the Northwestern line on which an engine had failed to operate because of weath-

er conditions. That after waiting for a considerable time at James, expecting the arrival of train No. 242 of the Northwestern Company, and being unable to get further orders because of the closed condition of said station, the conductor of defendant's train got into communication by telephone with the dispatcher of the Central Company at Cherokee, and was then for the first time advised of the condition, and was directed by the Cherokee dispatcher to take his train into Sioux City. That the weather on the night in question was cold and foggy, and while defendant's train was awaiting at James the arrival of the Northwestern train No. 242, its engine became more or less frozen, and upon receiving orders to take said train into Sioux City the conductor was unable, on account of the condition of said engine, to take the entire train at one time, and took the first part, or section, of said train as far as Leeds, a point within the city limits of Sioux City, and then returned to James, and brought to Leeds the last section of his said train; the car in question being in the first section brought to Leeds. That said conductor then proceeded with the said first section of his train to the terminal of the defendant company in the yards at Sioux City. That, while said car was being moved by the defendant from its terminals in Sioux City for delivery to the Sioux City Terminal Company to be unloaded, that portion of said train in which the car was being so carried was struck by switch engine No. 248, operated by defendant company, after the same had proceeded but a short distance towards said transfer track, and a further delay incurred by reason of said wreck, which was caused by the condition of the weather on the morning in question; the immediate cause therefor being the inability of the engineer of engine No. 248 to observe the signals given.

Because of the delays thus stated it is contended in behalf of the defendant that it is not liable for the statutory penalty by reason of its delay in unloading the cattle for food, water, and rest within the 36-hour period that it was authorized to detain the cattle without so unloading them. The act of Congress to which reference has been made provides in effect:

That no railroad, express company, or common carrier, other than by water, shall knowingly and willfully confine any cattle or other animals, transported by them in interstate commerce, for a period longer than 28 consecutive hours without unloading the same for rest, water, and food, for a period of at least 5 consecutive hours, unless prevented by storm, or by accidental or other unavoidable cause, which cannot be anticipated or avoided by the exercise of due diligence and foresight: Provided, that upon the written request of the owner or person in custody of the particular shipment the time of confinement may be extended to 36 hours; and any common carrier so offending shall be liable for a penalty of not less than $100 nor more than $500 for each such violation, to be recovered by civil action in the name of the United States.

[1] Under this statute it is incumbent upon the government to show by a preponderance of evidence that the defendant "knowingly and willfully" confined this shipment of cattle without unloading them for food, water, and rest for more than 36 consecutive hours after they were loaded in St. Paul (St. Joseph Stockyard Co. v. United States, 187 Fed. 104, 110 C. C. A. 432); and, if the proofs so show, then it

would be incumbent upon the defendant to show by a preponderance of the evidence that its failure to so unload them was caused by storm, or by accidental or other unavoidable causes, which could not have been anticipated and avoided by the exercise of due care and foresight (New York Central & Hudson R. R. Co. v. United States, 165 Fed. 833, 91 C. C. A. 519; United States v. Oregon Short Line Co. [C. C.] 160 Fed. 526). With these rules in mind, the facts stipulated, which are on file with the clerk as part of the record, may be considered.

[2, 3] The running time of defendant's train in which the cattle were carried' from St. Paul to Le Mars, is not shown, nor is the time the train was delayed at Le Mars, if delayed at all, shown, or for what purpose; but it does appear that the train left Le Mars for Sioux City, at 11:45 p. m., February 2, 1916, or 31 hours and 15 minutes after the cattle were loaded, and under ordinary conditions would have reached Sioux City, a distance of some 26 miles, in 1 hour and 30 minutes, and could then have been unloaded for the required feeding, water, and rest within the 36-hour period. The delay of the train between Le Mars and Sioux City appears to have been the fault of the Illinois Central train dispatcher at Cherokee, or of the Northwestern dispatcher at Sioux City, or perhaps both of them jointly, and defendant must be held to have known that its train from Le Mars to Sioux City was under the control and direction of the Illinois Central dispatcher at Cherokee, for all of its trains between Le Mars and Sioux City were being operated over the line of the Illinois Central Railroad under some arrangement with that company, and under the direction of its train dispatcher at Cherokee. Whether or not the Chicago & Northwestern Company had knowledge of, or anything to do with, the running of trains over the Illinois Central between Sioux City and Le Mars, does not appear, except that, inasmuch as the Northwestern Company was expecting on this date to run its train No. 242 between Sioux City and Le Mars over the Illinois Central road, and to meet defendant's train at James, a station on the Illinois Central line, the fair inference may be that it knew of the arrangement between the Central Company and the defendant company for the running of the defendant's train over the Illinois Central between Le Mars and Sioux City, for the Cherokee dispatcher had directed the conductor of defendant's train in question to meet and pass the Northwestern train at James, and the fair inference is that the Northwestern Company was in some way informed that defendant's train was to meet its train at James, and when the Northwestern abandoned its train No. 242 from Sioux City to Le Mars for that run informed the Cherokee dispatcher that it had so abandoned the same. In any event, there is nothing in the evidence to indicate that the conductor of defendant's train was misled in any manner by any action of the Northwestern Company, or its employés, in holding his train at James for the arrival of the Northwestern train.

As the train dispatcher at Cherokee was directing the movements of defendant's train, he must be held to be the agent of the defendant company in directing the conductor of its train to meet at James, on its

way to Sioux City, the Northwestern train, and his fault or neglect is the fault or neglect of the defendant company; and inasmuch as it appears that defendant's train was delayed at James from reaching Sioux City until at least 6:40 a. m. of February 2, 1916, or after the expiration of the 36-hour period, the defendant should be held responsible for such delay. But mere neglect on the part of defendant, or of the dispatcher at Cherokee, as the reason for failing to unload the cattle within the 36-hour period is not alone sufficient to warrant a recovery by the government; for it must first show the essential facts to warrant a recovery, and this requires a preponderance of proof in its behalf that the defendant "knowingly and willfully," or intentionally and purposely, failed to unload the cattle within the 36-hour period. Is there such proof in this case? Defendant's train left Le Mars for Sioux City at 11:45 p. m., February 1, 1916, a distance of 26 miles, which ordinarily would have been run in 1 hour and 30 minutes, which would bring the train into Sioux City by 2:15 a. m. of February 2, 1916. It did not arrive, however, until 6:40 a. m., or nearly 4 hours beyond the 36-hour period, and not until after defendant's train reached James did its conductor know that it could not meet the Northwestern train at that place, and was then ordered by the Cherokee dispatcher to take the train into Sioux City, 7 miles from James; and except for its frozen engine, and the wreck in the yards at Sioux City, did he have reason to believe that the cattle could not be unloaded within the 36-hour period.

I am of opinion, therefore, that the "facts stipulated" do not show that the government has proven by the required preponderance of evidence that the defendant's conductor of the train in question, or the defendant itself, "knowingly and willfully," or intentionally and purposely, intended, when the train left Le Mars or James, to not unload the cattle for the required food, rest, and water within the 36-hour period, or that defendant's conductor, when he left Le Mars, and again at James, when he was ordered by the Cherokee dispatcher to then run his train into Sioux City, could by ordinary diligence have avoided the delay in reaching the transfer tracks in Sioux City.

It follows that the judgment must be for the defendant; and it is accordingly so ordered.

---

⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes